SADIE BOREK, Plaintiff, *v.* BOYD E. GOLDER, as Mayor of the City of Utica, et al., Defendants.

Supreme Court, Oneida County, September 19, 1947.

*Frederick C. Kronmiller* and *Thomas B. Quinn* for plaintiff.

*Eugene Hanson* for members of the Municipal Housing. Authority of the City of Utica, defendants.

*J. Herbert Gilroy, Corporation Counsel (Stanley Palewski* of counsel), for Mayor of City of Utica and others, defendants.

*Nathaniel L. Goldstein, Attorney-General (Thomas Burke* and *A. W. Feinberg* of counsel), for State of New York, defendant.

*Edmund H. H. Caddy* and *Donald Schatz* for State Division of Housing.

NATHAN D. LAPHAM, Official Referee. This action is brought by a taxpayer of the City of Utica, New York, under the provisions of section 51 of the General Municipal Law against the Mayor, the City Clerk, the members of the Common Council, the members of the Board of Estimate and Apportionment, the members of the Municipal Housing Authority of the City of Utica, Herman T. Stichman, State Housing Commissioner, Frank C. Moore, State Comptroller and Nathaniel L. Goldstein, State Attorney-General.

By order of Mr. Justice FRANK P. MALPASS dated May 12, 1947, the action was referred to me as Official Referee to try, hear and determine. Hearings were held at the courthouse in the city of Utica on June 11th, 12th, 13th, 17th and 18th and the case finally submitted to me on July 24, 1947.

Mr. Moore and Mr. Goldstein were not served with process and, upon motion of Hon. A. W. Feinberg, Assistant Attorney-General, appearing specially therefor, the attorneys for the respective parties consenting thereto, an order was made in open court dropping their names from the summons. The term of office of Fritz A. Hedberg having expired prior to December 20, 1946, upon motion and by mutual consent, he was eliminated as a defendant and the name of his successor, Frank A. Emma, was added to the title as a party defendant. It was likewise

mutually stipulated that the answers interposed to the first amended complaint be deemed sufficient as answers to the second amended complaint which is the same as the first with the exception of paragraph 2a relating to the defendant Mr. Emma.

The plaintiff's cause of action rests upon the claim that, by reason of the illegal official acts of the defendants, the property of the City of Utica as well as that of the taxpayers thereof is being injured and wasted; and she prays that the defendants, the members of the Municipal Housing Authority of the City of Utica, be perpetually enjoined and restrained from issuing and selling to anyone temporary notes or certificates of indebtedness to be paid for through the subsequent issuance and sale of Authority or State housing bonds, and that said temporary notes or certificates of indebtedness be adjudged to be illegal, null and void, and a waste of the funds, property and estate of an instrumentality of government of the City of Utica; that the said defendants be perpetually enjoined and restrained from paying and distributing to any person or corporation any and all moneys and funds held in a general or special account for expenditure and distribution for the purposes defined in the revised plan and project and enumerated in the certificate of purposes issued or to be issued by said Authority, and that such expenditure and distribution be adjudged to be illegal, null and void, and a waste of the funds, property and estate of said Authority for which the City of Utica stands as obligor and guarantor; that the defendants, the officials of the City of Utica be perpetually enjoined and restrained from issuing or selling to anyone the bonds, temporary obligations or certificates of indebtedness of the City of Utica in payment for any of the purposes, public improvements, work, labor and services, for which the City of Utica has contracted to perform or engage in under the terms of the amended Loan and Subsidy Contract made between the Authority, the State of New York and the City of Utica, and that any such expenditure, commitment or appropriation be adjudged to be illegal, null and void, and a waste of the funds, property and estate of the City of Utica and of its taxpayers; that all acts and proceedings of the defendants, the members of the said Authority, and the officials of the City of Utica and the Common Council of the City in the passage and approval of the amended Loan and Subsidy Contract and in carrying out the terms and conditions of said Contract, and in complying with the amended plan and project, be adjudged to be null and void as being illegal and a waste of the public funds, money, property and credit of the City of Utica and of its taxpayers;

that the defendants, the members of the Municipal Housing Authority of the City of Utica, be held to account for any expenditure made, being made, or which they may have contracted to make, through or on account of the acquisition of such property or properties not deemed to be or legally held for a public purpose or use, for the purchase of other properties at a price in excess of the true and actual value of same as shown through appraisals heretofore made by competent and qualified appraisers of real property and for any expenditure alleged by the second amended complaint to be illegal and unconstitutional. In this connection it should be noted that, despite the prayer for injunctive relief, up to the present time no application has been made for a temporary injunction.

For purposes of brevity and convenience, I shall refer to the Municipal Housing Authority of the City of Utica as the " Authority ", to the Public Housing Law as the " Act ", to the City of Utica as the " City ", to the State of New York as the " State ", and to the amended Loan and Subsidy Contract as the " Contract ".

It seems that in the year 1943 the Authority entered into a contract pursuant to the provisions of the Public Housing Law with the State and the City for the financing and construction of a low-rent housing project as a part of a plan for the clearance and replanning of an insanitary and substandard area in the Second Ward of downtown Utica. There is no doubt but that it was a " substandard and insanitary " area within the meaning of the applicable statutory and constitutional provisions. The plan under the contract called for the construction of 500 dwelling units within this area, the clearance, replanning and construction to be financed by a loan from the State to the Authority under the provisions of article IV of the Act in an amount not to exceed $3,440,000. The City was to become contingently liable for the repayment of the loan with interest in the event of default by the Authority in accordance with provisions of article XVIII of the New York State Constitution and subdivision 2 of section 51 of the Act. Out of proceeds of rentals to be derived from this venture and the subsidies to be paid by the State and City to the Authority according to the Act, the loan with interest was to be repaid over a period of fifty years. Pursuant to the provisions of section 73 of the Act, the contract of 1943 provided for the payment of a periodic annual cash subsidy by the State to the Authority equal to the largest annual installment of interest on the loan plus 1% of the cost of the project. Likewise, the City agreed to match this cash subsidy

by payments in the form of tax exemptions of the excess of assessed valuation of the property held by the Authority upon completion of the project over the assessed valuation of the property at the date of the contract (Act, § 52, subd. 4; § 73). The Second Ward project was divided into two parts, the " defense housing " to meet the urgent needs of the hour involving the construction of 150 dwelling units, and the " post-war housing " to meet the general needs of the community involving the construction of 350 units. This contract with the plan and project was approved and adopted by the Authority, City and State. One hundred and forty-seven of these dwelling units, known as Washington Courts but here referred to as Site A, were constructed and are now in use.

During 1946, following conferences between the members of the Authority, the State Division of Housing, the officers of the City, together with various groups of public-minded citizens, with reference to the construction of the postwar section of the project, a proposal was made to modify and extend the original plan to 400 instead of 350 such units, to be constructed in two areas of 200 units each and in parts of the City other than adjacent to Site A, contrary to the previous plan. This proposal was finally embodied in the amended Loan and Subsidy Contract, the subject of the present litigation. One of the proposed sections is located in the northerly part of the City adjacent to Herkimer Road in the Sixteenth Ward and referred to as Site B, and the other is in westerly or Sunset Park district of the City and referred to as Site C. The revised Contract, and the plan and project thereunder, provide for clearance and replanning of the remainder of the substandard and insanitary area in the Second Ward although the balance of the housing units are to be constructed elsewhere, the plan being to raze the buildings in this section and encourage the construction of modern factories under restrictions which will protect the Washington Courts site. This area is designated as Site D. The revised Contract, including the plan and project, was approved by the Common Council, the Board of Estimate and Apportionment of the City, the State Commissioner of Housing and the Authority. In accordance with the provisions of section 73 of the Act the Contract was entered into by the Authority, the State and the City and approved as to form by the Comptroller and Attorney-General and, under the Contract, provision was made for a loan by the State to the Authority in the amount of the cost of the project but not to exceed $4,629,000.

Since the commencement of this action the Commissioner of Housing has made and delivered to the Authority the findings required by section 71 of the Act and all conditions precedent to the making of such loan have been met. Proceeding under the revised Contract, the Authority advertised for bids on temporary loans, the usual precautionary steps were taken and such financing was about to be consummated when the present action was instituted. The consequent inability to furnish the customary certificate of "no action pending" halted such financing.

After a careful study of the record, I am unable to find any evidence indicating fraud, collusion or willful misfeasance on the part of the commissioner or of any official whose acts are here involved. There is no suspicion or claim of personal interest or gain, past, present or future.

We need devote no space to the question of constitutionality of the Act. The basis therefor is found in article XVIII of the Constitution. (*Davidson* v. *City of Elmira,* 180 Misc. 1052, affd. 267 App. Div. 797, motion for leave to appeal denied 292 N. Y. 723; *Matter of Murray* v. *La Guardia,* 291 N. Y. 320.)

Likewise, we need give no time to the consideration of the fundamental right of the citizen to seek protection against illegal taxation. Such is the law of this State (Civil Rights Law, § 3; General Municipal Law, § 51; Second Class Cities Law, § 22).

We are concerned, however, with the question: Have the defendants or any of them so illegally acted in the premises as to result in injury to the plaintiff, or in waste and injury to any property, funds or estate held in trust by them?

Until we find the defendants guilty of illegal official acts which fall within at least one of the foregoing categories, I deem it unnecessary to review the cases cited by plaintiff dealing with the consequences of dereliction of official duty. In order to answer this question, it becomes incumbent upon us to review the general statutory and legal background of the action and the defenses interposed thereto.

The former State Housing Law (L. 1926, ch. 823) declared certain city areas to be insanitary and substandard, and the necessity for the investment of public funds for the construction of housing facilities and the creation of agencies of the State for that purpose.

Article XVIII of the Constitution of this State as adopted by the Constitutional Convention of 1938 and approved by the people November 8, 1938, provides for: " * * * (1) low rent

housing, (2) for clearance and reconstruction of substandard and insanitary areas, or (3) for both. Section 10 empowers the Legislature to make all laws necessary and proper therefor and that the article shall be construed as *extending powers limited by other articles* and not as imposing additional limitations. Section 2 empowers the Legislature ' notwithstanding any provision in any other article of this constitution ', in aid of its purposes, to provide capital and subsidies to municipal or public corporations, to authorize any city to guarantee the principal and interest on indebtedness and to grant or authorize tax exemptions for not more than sixty years." (*Davidson v. City of Elmira, supra,* p. 1054.)

Following the adoption of article XVIII, the Legislature enacted a new Public Housing Law (L. 1939, ch. 808) in conformity with the provisions of said article and repealed the former State Housing Law (L. 1926, ch. 823, as amd.). The 1939 Act was amended in 1941 and 1942 by declaring in substance " * * * certain city areas to be insanitary and substandard, the absence of an adequate supply of safe and sanitary dwellings, the necessity for the investment of public funds for the construction of standard housing facilities and that these conditions required the creation of agencies of the State for that purpose." (*Davidson v. City of Elmira, supra,* p. 1054.)

The Municipal Housing Authority of the City of Utica had been created before the Act of 1939. Section 56 of the Act continues its existence as constituted " as an authority under the provisions of this chapter." Subdivision 2 of section 3 of the Act specifically includes the Municipal Housing Authority of the City of Utica, New York, as an " authority " to effectuate the purposes of article XVIII of the Constitution.

Subdivision 5 of section 3 of the Act provides: " The terms ' municipal corporation ' and ' municipality ' mean a city, town or village; and the term ' municipal ' shall be deemed to relate to a city, town or village."

Subdivision 7 of section 3 provides: " The term ' local legislative body ' means: (a) in a city, the board of aldermen, common council, council, commission or other board or body now or hereafter vested by its charter or other law with jurisdiction to enact ordinances or local laws, except that if there be a board of estimate, the term shall mean only such board of estimate; (b) in a town, the town board; (c) in a village, the board of trustees."

Subdivision 12 of section 3 provides: " The term ' area ' means a section of the municipality wherein the commissioner

or an authority or a municipality finds that insanitary or sub-standard housing conditions exist. *An area may include land whether improved or unimproved, and buildings or improvements not in themselves insanitary or substandard, the inclusion of which is deemed necessary by the authority or the municipality or the commissioner,* * * * for the effective clearance, replanning, reconstruction or rehabilitation of the area of which such land or property is a part." (Italics mine.)

Subdivision 13 of section 3 provides: "The term 'plan' means a plan or undertaking for the clearance, replanning and reconstruction or rehabilitation of a substandard and insanitary area or areas and for recreational and other facilities incidental or appurtenant thereto to effectuate the purposes of article eighteen of the constitution or any other provision of the constitution delegating any similar power or providing homes for persons of low income."

Subdivision 16 of section 3 provides: "The term 'state project' means a project aided or financed in whole or in part by the state and not by the federal government."

Subdivision 17 of section 3 provides: "The term 'municipal project' means a project other than a state project or a federal project."

Subdivision 23 of section 3 provides: *"The term 'low rent housing' means dwellings within the financial reach of families of low income and embraces recreational and other facilities incidental and appurtenant thereto."* (Italics mine.)

Article II of the Public Housing Act relates generally and specifically to the powers and duties of the Division of Housing, a branch of the Executive Department of the State. The Commissioner of Housing is the head of the division. Among his powers, I call attention to those that have a direct bearing in this taxpayer's action. By the following sections of this article, the Commissioner of Housing has the power to:

Clause (j) of subdivision 1 of section 14 — "* * * require an authority to file periodic reports * * * covering its operations and activities * * *."

Subdivision 2 of section 14 — "* * * make and execute contracts and other instruments necessary or convenient to the exercise of his powers relating to state loans and subsidies. The commissioner shall have power to sue in the name of the people of the state; to enforce, by appropriate actions or proceedings, any rights of the state conferred by any law, mortgage, lien, bond, contract or agreement and shall be represented in all litigated matters by the attorney-general."

Section 15 — " With regard to duties or liabilities arising out of this chapter, the state or the commissioner may be sued in the same manner as a private person. In any action or proceeding affecting any state project or the project of a housing company the commissioner shall be given notice thereof, and he shall take such steps in such action or proceeding as may be necessary to protect the public interest. * * * "

Subdivision 2 of section 16 — " To order the authority * * * to do such acts as may be necessary *to comply with the provisions of this chapter, or any rule or regulation adopted by the commissioner, or the terms of the contract for state aid, or to* refrain from doing any act in violation of any of the foregoing." (Italics mine.)

Subdivision 4 of section 16 — " To permit the consolidation of two or more approved state projects or *the extension or amendment thereof* or the consolidation of any approved state project with a proposed project. In any such case, the consolidated state project shall be treated as an original state project and an application shall be submitted as in the case of an original state project and the rents and costs of the consolidated project may be averaged. Consolidation hereunder may be permitted *regardless of whether the state projects to be consolidated are contiguous or adjacent to each other.* Such contracts as may have been made with regard to approved state projects may, upon consolidation of the projects, also be consolidated and contracts for consolidated state projects shall be subject to all the provisions of this chapter, governing original state projects." (Italics mine.)

Article III of the Act relates to municipal housing authorities, their powers and duties. Section 38 thereof provides:

" An authority shall file with the commissioner a copy of each proposed project embodying the plans, layout, estimated costs and proposed method of financing. *Any change made in the project shall be filed with the commissioner by the authority.* With reasonable promptness after each project shall have been completed, and from time to time prior to completion upon request of the commissioner, an authority shall file with the commissioner a detailed statement of the cost thereof.

" Upon receipt of a copy of a proposed state project, or of *any proposed change therein,* the commissioner may transmit his criticisms and suggestions with reasonable promptness to the authority or the municipality. No change in a state project may be made by an authority or a municipality without the approval of the commissioner." (Italics mine.)

Sections 39 and 40 have no application. Sections 41 to 50 have no bearing in this case as the Authority did not issue its own bonds.

Section 51, as it read at the time the State loan was contracted, provided as follows:

" 1. The bonds or other obligations of an authority shall not be a debt of the state or the municipality and neither the state nor the municipality shall be liable thereon nor shall an authority have power in any way to pledge the credit of the state or the municipality, nor shall the transfer from the authority to the municipality or the vesting in the municipality of property theretofore belonging to an authority impose upon the municipality any obligations except such as it may expressly assume. The foregoing provisions shall not apply in the event of a guaranty by a municipality of the bonds or obligations of an authority.

" 2. Notwithstanding the provisions of the foregoing paragraph, a municipality shall be liable for the repayment of any loans and interest thereon made by the state to an authority, acting as an instrumentality of such municipality. In the case of a city, such liability shall be excluded in ascertaining the power of such city to become indebted pursuant to the provisions of this chapter, except that in the event of a default in payment under the terms of any such loan, the unpaid balance thereof shall be included in ascertaining the power of such city to become so indebted."

The last sentence of section 51 of the Act, commencing " In the case of a city ", has been eliminated by chapter 710 of the Laws of 1943, effective September 2, 1945, as changed by chapter 606 of the Laws of 1944 and section 64 of chapter 338 of the Laws of 1945. The amendment was required by section 150.00 of the Local Finance Law and does not affect this Contract nor change the sense of section 5 of article XVIII of the Constitution.

Section 52 provides, among other things, as follows:

" 3. *Except as to state projects,* the property of an authority *shall be exempt from all local and municipal taxes.* A municipality may (a) fix a sum which shall be paid to it annually by the authority in respect of each project; or (b) agree that the authority shall not pay or be liable to pay any sum whatsoever in respect of a project or projects for any year or years; or (c) agree with an authority or government upon the sum to be paid by the authority for any year or years in respect of a project or projects, or accept or agree to accept a fixed sum or other consideration in lieu of such payment; provided, however, that

the sum fixed, or agreed to be paid by the authority, for any year shall in no case exceed the sum last levied as an annual tax upon the property included in such project prior to the time of its acquisition by the authority $*$ $*$ $*$.

" 4. So much of the value of the property included in a state project as represents *an increase* over the assessed valuation of the real property, both land and improvements, on the date of the contract for a state loan, or, in the absence of a contract for a state loan, then on the date of the contract for a state subsidy, *shall be exempt* from any and all state, county, city, village, town, school and special district taxes. In no event may any municipality or county assess the property included in a project at an amount in excess of the actual cost of the project." (Italics mine.)

Article IV of the Act provides for State aid which consists of State loans and State subsidies. Sections 70 to 76 of this article define in part the statutory relations governing the State represented by the State Commissioner of Housing, the Authority, and the city in respect to contracts for State-financed public housing projects. Section 70 provides: " *State loans.* The commissioner may, in the name of the state, enter into contracts for loans to an authority or a municipality for one or more projects, though a project has received or will receive aid from any other source, except the federal government. All such contracts shall be subject to approval by the state comptroller, and by the attorney-general as to form. Any such loan shall be in such amount as the commissioner, in his discretion, may deem necessary to insure the completion, availability for lawful occupancy and use of the project. No loan shall be made in an amount greater than the project cost, nor until the municipal comptroller and local legislative body have attached their separate approvals to the loan contract. The commissioner may make temporary loans or advances to a housing authority in anticipation of such loan and no such temporary loan or advance shall be deemed to constitute part of such loan unless such temporary loan or advance has been made out of the proceeds of definite housing bonds sold by the state pursuant to section sixty of the state finance law."

Section 71 provides: " *Conditions precedent to state loans.* 1. No loan shall be made unless the commissioner finds that: (a) the project is in conformity with a plan or undertaking for the clearance, replanning, reconstruction or rehabilitation of a substandard and insanitary area or areas and for recreational and other facilities incidental or appurtenant thereto;

" (b) The municipality in which such project is to be located has enacted or will enact zoning regulations, or other restrictions adequately protecting the area or areas in which the project is to be undertaken, against future uses likely to depreciate unduly the value of such project;

" (c) The estimated revenues, including any governmental grants, of the project or part for which such loan is to be made will be sufficient to pay all fixed charges, probable cost of operation and maintenance, and depreciation at a rate deemed reasonable by the commissioner, but in no event less than one-half of one per centum per annum of the cost of the improvements;

" (d) The plans and specifications conform to the requirements of this and all other laws applicable thereto, assuring adequate light, air, sanitation and fire protection;

" (e) Adequate open spaces for recreation are provided within the project or provision therefor has been made conveniently near the project; stating the manner in which such spaces are provided or are proposed to be within the project or near thereto;

" (f) Adequate school facilities are near the project or provision therefor has been made, listing such facilities;

" (g) The occupants of the proposed housing accommodations will have convenient access to probable places of employment;

" 2. *Such findings shall be conclusive evidence of the facts therein contained except upon proof of fraud or wilful misfeasance by the commissioner.*" (Italics mine.)

Section 72 provides generally for the terms of the State loan. It should be noted that the loan is to be repaid.

Section 73 provides for the State subsidy. The subsidy received from the State is not repaid. The last paragraph of this section reads as follows: " *State subsidies.* * * * No state subsidy shall be made available for any project unless and until: (a) *the municipality in which such project is situated shall contract or have contracted to make subsidies to such project in an amount at least equal to the subsidy contracted to be made by the state, all or any part of which municipal subsidy may be in the form of exemption of the project from local or municipal taxes to the extent specified in subdivision four of section fifty-two of this chapter; (b) the findings required by section seventy-one of this chapter have been made by the commissioner. Such findings shall be conclusive evidence of the facts therein contained except upon proof of fraud or wilful misfeasance by the commissioner.*" (Italics mine.)

Article V of the Act provides for municipal aid. Sections 90 and 91 were effective at the time this State loan and subsidy were contracted. My comment following section 51 is applicable here.

Section 92 relating to municipal bonds has no application in the instant case as none have been issued or contemplated by the State loan contract.

Section 93 authorizes loans. Under this section a loan of $3,000 or thereabouts was made by the City to the Authority but has been fully repaid.

Section 94 authorizes municipal periodic subsidies "payable only with *moneys locally appropriated therefor * * *.*" (Emphasis mine.) This section has no application to this case since the subsidy of the City *is not available with moneys locally appropriated,* but is in the form of an exemption of the project from local and municipal taxes as the Act and Contract provide. (*Davidson* v. *City of Elmira,* 180 Misc. 1052, *supra.*)

Sections 95 to 98, inclusive, have no application here. Section 99 provides: "*Municipal services.* In connection with projects located within its respective territorial boundaries, a municipality * * * may, upon such terms, with or without consideration, as the local legislative body of such municipality or the governing body of such district may deem advisable, render or contract to render services to an authority, housing company or a government, or provide and maintain parks, sewerage, or other facilities adjacent to or in connection with a project. A municipality or a district hereinabove described may also render or contract to render such services and to provide such facilities in connection with projects located outside its respective territorial boundaries upon such terms and consideration as shall, in the determination of the local legislative body of such municipality or the governing body of such district, which determination shall be conclusive, compensate such municipality or district for the cost of furnishing such services and facilities. A municipality may enter into an agreement with an authority, housing company or a government, upon such terms as it shall determine, with or without compensation, to open, pave, install, close or change the grade of streets, roads, roadways, alleys, sidewalks, or other places, to change the municipal map, to plan, replan, zone or rezone any section of the municipality. In connection with the exercise of this power a municipality may, if it deems advisable, incur the entire expense of any such public improvements located within its territorial boundaries *without assessment against abutting*

*property owners,* or contract with an authority upon such terms, with or without consideration, *as it may deem advisable,* with respect to the exercise by the municipality or government of its powers relating to the repair, closing or demolition of unsafe, insanitary, or unfit dwellings, and with respect to aid and cooperation by the municipality or government in the planning, undertaking, construction or operation of projects.'' (Italics mine.) A reading of this section reveals full authority for the many services and street changes which the City has contracted to make.

Certainly, expenditures by the City authorized by statute and contract cannot be rightfully said to be illegal or wasteful.

We are not concerned with articles VI and VII. Article VIII relates to approval, construction, management and operation of projects. Section 150 relates to the approval of plans and projects. The record shows that the approval of the municipal bodies has been had. With articles IX and X we have no concern. Article X-A relates to defense housing and sets forth the differences between defense housing and other housing for ''persons of low income'' (§ 215). Section 216 sets forth the additional powers of authorities in cases of defense housing. Subdivision 1 of section 217 requires the authority to make a finding as to the shortage of adequate, safe, and sanitary dwellnigs, etc., and section 218, relating to the powers and duties of the commissioner, grants him power, in addition to the powers heretofore granted by this chapter, to enter into State contracts for State loans to an authority for defense housing.

The original application of September 25, 1943, as revised October 5, 1943, is based on findings of the Authority as to the necessity for defense housing (adopted August 5, 1943) and as to the necessity for postwar rent housing (adopted October 5, 1943).

Acting State Commissioner of Housing Robbins, in turn, pursuant to section 218 of the Act, approved the findings made by the Authority on August 5, 1943, and in the same instrument made the findings authorized and required pursuant to section 71 of the Act in relation to defense and postwar housing.

The application for the State-financed public housing project embracing the defense housing section and the postwar housing section, became part of the State Contract for a loan and subsidy to the Authority.

Later on August 12, 1946, a revised application was submitted and the revised Contract executed December 12, 1946. Much stress has been laid upon this amendment of the Contract. The

authority to amend a contract with the consent of all the parties thereto is no longer in doubt. Aside from the common-law right to amend such an instrument, I find statutory authority in subdivision 3 of section 14, subdivision 4 of section 16, section 38 and section 99 of the Act. The original project seems to have met with the approval of the plaintiff, or, at least; been accepted as a defense measure now completed. The complaint rests upon the change brought about through revision. The court must now determine whether, by revision, an otherwise concededly legal contract, plan and project was so transformed that its completion would cause an illegal waste of the property, funds or estate of the municipality and consequent waste and injury to the taxpayers.

Under the revised Contract a contingent liability on the part of the City was created payable only in the event of default by the Authority but "Such contingent liability is not a City debt within the meaning of limitations on the power of a city to incur indebtedness. Section 73 of the Charter is a limitation on the power of the city to create a *present debt.* * * * 'The obligation of a contract does not become a debt, within the sense of the prohibitions of a city charter forbidding the common council from authorizing an expenditure within the current year exceeding the amount of the annual tax levy, until money becomes payable according to its terms.' " (Italics mine.) (*Davidson* v. *City of Elmira,* 180 Misc. 1052, 1059–1060, *supra.*) Since no *present debt* arises from this contingency, the plaintiff's fear in this respect is anticipatory rather than real.

She also asserts that "the City must match the State subsidy either in tax exemption or tax exemption and cash ". By paragraph 201 of the Contract, as amended, the State subsidy is an amount not exceeding the largest annual installment of interest plus 1% of the project cost. In the revised application of August 12, 1946 (which is a part of the Contract by reference and incorporation), it is estimated that the State subsidy will be $127,298 and the local partial tax exemption $195,585. The Contract does provide for a City subsidy in an amount at least equal to the State subsidy but a study of these figures shows that the City will not be called upon to pay any cash subsidy *or incur any debt by reason of this contract on account of any city subsidy.*

I am unable to discover how the City has incurred or contracted for any *present debt* through these contingent and subsidy obligations.

This being a taxpayer's action, the plaintiff's remedy is statutory only. Writing for the Court of Appeals upon this subject, Judge CHASE said: "* * * * The courts of this state hold that at common law a taxpayer, as such, has no right of action against a public officer to restrain or prevent the waste of public funds or injury to public property, or to restrain a threatened illegal official act. [Citing cases.] Such an action may be maintained pursuant to the provisions of section 1925 of the Code of Civil Procedure, or section 51 of the General Municipal Law, (Cons. Laws, ch. 24) and is recognized by section 28 (formerly 27) of the Civil Service Law. The authority therefor, if at all, must be found in such statutes, or one of them." (*Olmsted* v. *Meahl*, 219 N. Y. 270, 274.) Formerly section 1925 of the Code of Civil Procedure and section 51 of the General Municipal Law limited the scope of the relief provided. With the repeal of this code and the substitution of the Civil Practice Act, section 1925 of the Code was omitted, leaving section 51 of the General Municipal Law as the sole statutory authority for maintaining a taxpayer's action " to prevent any illegal official act on the part of any such officers, agents, commissioner or other persons, or to prevent waste or injury to, or to restore and make good, any property, funds or estate of such county, town, village or municipal corporation * * *."

Section 51 of the General Municipal Law should be read in connection with section 2 of article XVIII of the Constitution which provides in part as follows: "As used in this article, the term 'public corporation' shall mean any corporate governmental agency (except a county or municipal corporation) organized pursuant to law to accomplish any or all of the purposes specified in this article" and with subdivision 2 of section 3 of article I of the Public Housing Law which defines an "authority" as: "* * * a public corporation which is a corporate governmental agency (except a county or municipal corporation) organized pursuant to law to accomplish any or all of the purposes specified in article eighteen of the constitution and includes the following municipal housing authorities established prior to the first day of January, nineteen hundred thirty-nine pursuant to chapter four of the laws of nineteen hundred thirty-four and amendments thereof, namely, * * * municipal housing authority of the city of Utica, New York, * * *." So plain is the wording of the statute that, by no stretch of the imagination can the Authority here under consideration be construed as an integral part of the municipal corporation known as the City of Utica. Rather it is a public

corporation with an independent corporate entity authorized by the Legislature to conduct its affairs in the manner prescribed by the Act (*Matter of N. Y. City H. Authority* v. *Muller,* 270 N. Y. 333, 337). Even the power of the Mayor to appoint and remove members of the Authority is not rooted in his office, but is delegated to him by legislative enactment (Act, § 30, subd. 2). Therefore, it would seem clear that the instant action will not lie against officers acting on behalf of the State, the State Housing Commissioner or the Municipal Housing Authority of the City of Utica (*Olmsted* v. *Meahl,* 219 N. Y. 270, *supra; Brooks* v. *Wyman,* 246 N. Y. 534, affg. 220 App. Div. 204; *Hamilton* v. *Baker,* 243 N. Y. 578).

Even assuming, without holding, that the section is broad enough to embrace the foregoing agencies, plaintiff has failed to convince me that they, or either of them, were guilty of the acts charged in the complaint. Section 71 of the Act lays down certain conditions precedent to an application for a State loan, such as a plan for clearance, replanning, reconstruction or rehabilitation of a substandard and insanitary area, protective zoning regulations, sufficient estimated revenues, and provisions for adequate light, air, sanitation, fire protection, convenient recreational spaces, school facilities and places of employment, and states: "2. Such findings shall be conclusive evidence of the facts therein contained except upon proof of fraud or wilful misfeasance by the Commissioner." The plaintiff, while admitting that she did not allege any specific claim of fraud as to the findings of the commissioner on the revised application, points to some differences in his findings and the original application and findings of the then acting commissioner and would have the court infer therefrom that the present findings are fallacious, without foundation and fraudulent. The very fact that a revision was thought advisable evidences a difference of opinion on the more leisurely consideration of the postwar housing after the urgency of the defense program had eased. The Act (§ 38) recognizes the legitimacy of changes by providing the method for such action. When such change is followed through to the issuance of findings by the commissioner, as here, those findings are conclusive unless fraud or willful misfeasance are shown. There being no such evidence in this case which would justify the court to intervene, I am bound by the mandatory provisions of section 71.

If we bear in mind that sections 1 and 2 of article XVIII of the Constitution empowers the Legislature to provide for housing for persons of low income and in accomplishing this result,

to enact legislation subject to the limitation contained in the article *"notwithstanding any provision in any other article of this constitution"* (italics mine), we are able to by-pass several of the questions submitted for the court's consideration. The following contentions are illustrative: Plaintiff alleges that the undertaking of the City to widen and locate certain streets without assessing a part of the cost of such improvement upon the property owners was an illegal act. If we consider the action of the City in the light of section 99 of the Act all confusion is dissipated.

Again the plaintiff alleges that the Contract is illegal in that an ordinance providing for the sale of land owned by the City of Utica was passed by less than a required three fourths of the full membership of the Common Council of the City. If the plaintiff rests this action upon the provisions of section 37 of the Second Class Cities Law, she has overlooked the fact that section 124 of the Act justifies the exercise of the power of alienation "notwithstanding any other provisions of law". The section emphasizes this power in these words: "* * * Notwithstanding any general, special or local law and any limitation or prohibition which may be contained therein against the power of alienation, any grant, sale, conveyance or lease may be made by a government to an authority or government in connection with a project, without appraisal, public notice, advertisement or public bidding. * * *"

As a further evidence of the Authority's complete independence of the City, we refer to section 120 of the Act which provides for the acquisition of real property and concludes as follows: "The provisions of this article with respect to condemnation of property by or for an authority shall prevail over the provisions of any other general, special or local law."

Furthermore, section 37 of the Second Class Cities Law has to do with the "sale or lease of city real estate". It seems to me clear that this section was designed to regulate the selling or leasing of property within the ordinary acceptation of those terms as distinguished from granting, conveying or leasing its property to an authority or government as provided in section 124 of the Act: "* * * The finding of the government having jurisdiction that the property is no longer required for the public purpose for which it is devoted and that it is to the best interest of the government involved to grant or lease the property, shall be conclusive."

It is the claim of the plaintiff that the provision contained in the second paragraph of subdivision 5 of the Contract is void

and illegal; that upon information and belief no public necessity has been passed upon and approved by the Public Service Commission of the State for the construction of an underpass and no order has been issued by any public party charged with the duty of determining and fixing the amount chargeable and assessed against the N. Y. W. S. (Baltimore) Railroad to the extent of 50% of the cost of such improvement. The provision of the Contract reads as follows: "The city will acquire the necessary land, construct and maintain an underpass and approaches for vehicular and pedestrian traffic under the N. Y. W. S. & Baltimore Railroad from Roosevelt Drive to Meriline Avenue at its own cost and expense within a period of one year after substantial completion of the project."

The project has not as yet advanced to a point where the Public Service Commission has determined the manner in which the underpass is to be constructed and it naturally follows the cost cannot be computed until after this is accomplished. But this does not affect the contract. All that is necessary at this time is the understanding that the construction cost and maintenance of the proposed underpass are not a part of the project but a matter between the City and railroad. Under this Contract it cannot be said that the parties intended that the City should bear the entire expense of the underpass as between itself and the railroad company, but only as between itself and the other parties to the contract. It is true that construction of the underpass must be authorized by the Public Service Commission under the procedure outlined in section 90 of the Railroad Law, the costs to be equally divided between the municipality and the railroad company (Railroad Law, § 94). The defendants concede that the Contract is subject to the proper exercise of the regulatory power of the Public Service Commission in the construction of the proposed underpass. If the Contract is read with reference to the appropriate provisions of the law by which the State has reserved its regulatory power over railroad crossings, then the claim of the plaintiff that the Contract is absolute upon its face must fall. Judge CARDOZO, in applying the same rule to a municipal street car franchise containing conditions relative to the rates of fare and the power of the Public Service Commission to regulate the same, has this to say: "The obligation of a contract is determined by the law in force when it is made * * *. Statutes then existing are read into the contract. They enter by implication into its terms. They do not change the obligation. They make it what it is. The statute which clothed the commission with jurisdiction to increase charges if

found to be inadequate, was notice to municipalities that franchises thereafter granted must be coupled with no conditions inconsistent with the jurisdiction thus conferred. The commission is now holding the city to terms which were accepted by implication when the conditions were imposed. * * * This is merely to give effect to the settled rule that contracts are made in submission to existing legislation." (*People ex rel. City of New York* v. *Nixon,* 229 N. Y. 356, 361.) If we, therefore, read into the Contract the provisions of the Railroad Law aforesaid, the Contract is not illegal in the respect complained of.

Let us now consider the plaintiff's claim that the Contract involves the creation of a funded debt of the City and calls for the approval of two thirds of the full membership of the Common Council. Section 33.00 of the Local Finance Law so provides but clearly indicates that its purpose is to regulate the issuance of bonds and notes of a municipality. No such obligation is provided for by this Contract. The only bonds to be issued are those of the State. The indebtedness of the Authority to the State is not evidenced by bonds or notes but solely by the Contract under which the Authority is primarily liable on the State loan. The provisions of law relating to the creation of a present indebtedness by a city have no application to the making of a Contract for a State loan such as is involved in this case (*Davidson* v. *City of Elmira,* 180 Misc. 1052, 1060, *supra*). In this connection we find section 5 of article XVIII of the Constitution providing: "* * * Such [contingent] liability of a city shall be excluded in ascertaining the power of such city to become indebted pursuant to the provisions of this article, except *that in the event of a default* in payment under the terms of any such loan, the unpaid balance thereof shall be included in ascertaining the power of such city to become so indebted. * * * " (Italics mine.) In the *Elmira* case (*supra*) it was contended that a proposed State loan to the authority would involve a violation of constitutional limitations upon the amount of indebtedness which could be contracted by the city, as well as illegality as to the manner in which the city officials could contract indebtedness. Both these contentions were rejected at Special Term and that decision was unanimously affirmed by the Appellate Division (267 App. Div. 797).

The plaintiff also claims that the agreement of the City for the planning, replanning, zoning, and rezoning of areas involved in the Contract, plan and project is illegal and void as contrary to the zoning law and regulations of the City as amended. The provisions of the agreement are specifically authorized by

section 99 of the Act which provides in part as follows: "A municipality may enter into an agreement with an authority, * * * with or without compensation, * * * to change the municipal map, to plan, replan, zone or rezone any section of the municipality." This is a wise provision without which a housing program would be faced by almost insurmountable obstacles and its purpose liable to defeat. I find the agreement for rezoning is in harmony with the provisions and purpose of the Act. Having found no proof of fraud or willful misfeasance on the part of any of the defendant officers, the finding of the commissioner with reference to zoning the area involved is conclusive upon this court.

The plaintiff further claims that by adopting a plan and project providing for additional housing units to be constructed outside the substandard and insanitary areas, the defendants engaged in an arbitrary, capricious and wrongful act which was illegal and unconstitutional, and contrary to the spirit of the law in that it necessitated zoning downward to permit multiple housing in Sites B and C. The acute need of housing and the trend toward multiple units is so generally accepted that a change of zoning to permit such developments is not sufficient to establish illegality. In fact, there is statutory permission for placing dwelling accommodations outside substandard areas. Section 1 of article XVIII of the Constitution authorizes the Legislature to provide "* * * for low rent housing for persons of low income as defined by law, or for the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas, or *for both* such purposes, and for recreational and other facilities incidental or appurtenant thereto." (Italics mine.) Pursuant to the authority thus bestowed, the Legislature enacted the Public Housing Law. Subdivision 14 of section 3 of this Act, after defining the term "project", continues in part as follows: "Subject to the provisions of article eighteen of the constitution with respect to state projects, such *dwelling accommodations may be provided in any section of the municipality, whether or not such section has insanitary or substandard housing conditions.*" (Italics mine.) No change of zoning should be arbitrary and in disregard of existing conditions. Thought, caution and a study of all the pertinent factors should precede any rezoning. In this case, we must bear in mind that the B and C Sites were in practically open terrain — B having a few buildings and C a fringe of houses. Surely, the decision to construct these postwar units outside a substandard and insanitary area did not imply they had to be located in the

fields. Indeed, the requirements of accessibility must be met. The sites selected appear to be a sound and wise solution. I can reach no other conclusion than that the revised Contract, plan and project providing for the additional housing units fall squarely within the provisions of the Constitution and the Act, and bear no taint of an arbitrary, capricious, wrongful, illegal or unconstitutional act.

Plaintiff also charges that the Authority is wasting public moneys by incurring "indebtedness through the acquisition of land" as a site for the construction project in the Sixteenth Ward "at a price 400% of the present assessed valuation"; and, again, that there is a definite and ascertainable waste of public moneys in the purchasing of excess land and properties within the fourteen-acre area in the Second Ward at a price far in excess of, and without regard to, appraisal values for these properties when they were being purchased as a site of the then proposed postwar housing project. Considering these allegations in the light of the failure of the plaintiff to establish upon this trial that either the original or the revised Contract, plan and project are tainted with dishonesty, fraud, collusion, corruption, bad faith or illegality, this court is precluded from supervising the exercise. of administrative discretion in the purchase of these parcels. The late Mr. Justice EDGCOMB, formerly of our Appellate Division, while serving as an Official Referee, set forth the rule applicable here with the clarity and thoroughness for which he is renowned. I quote: " In the absence of illegality, fraud, collusion, corruption or bad faith, the court has no power to restrain the city from entering into or carrying out any agreement which it chooses to make. The terms 'waste' and 'injury,' as used in the statute, comprehend only wrongful, dishonest or illegal official acts, and are not intended to subject the action of an administrative official, acting within the limits of his authority and jurisdiction, to the scrutiny and control of a judicial tribunal. The court has no power or authority, much less the disposition, to regulate or superintend the official acts of one holding a civil appointment or to make itself the arbiter of a dispute between some dissatisfied taxpayer and the municipal authorities as to the advisability or wisdom of entering into some particular contract. [Citing cases.]" (*Hanrahan* v. *Corrou,* 170 Misc. 922, 925.)

In the words of Judge FINCH: " We have quite recently declined to become arbitrators between taxpayers and their municipal officers in every instance of disagreeing opinions or conflicting judgments, and have decided that, jurisdiction in the

officials existing, the courts can interfere in actions like that before us only where some fraud or collusion or bad faith is alleged and proved. (*Talcott* v. *Buffalo,* 125 N. Y. 280.)'' (*Ziegler* v. *Chapin,* 126 N. Y. 342, 348.)

In the following taxpayer's action, Chief Judge POUND, in applying the same rule, said: ''The possible lack of wisdom is not the lack of authority. We cannot run the affairs of the village for it.'' (*Kelly* v. *Merry,* 262 N. Y. 151, 160.)

The courts have gone so far as to declare that it is incumbent upon the plaintiff, if he would succeed, to establish that the contract ''* * * is the result of illegal official acts. Unless he establishes this, it matters not how unwise or extravagant the contract appears; the court may not interfere.'' (*Dunning* v. *County of Orange,* 139 App. Div. 249, 251, affd. *sub nom. Dunning* v. *Elmore & Hamilton Contracting Co.,* 204 N. Y. 647.)

Chief Judge CARDOZO, writing on the same subject expressed the views of a unanimous court in these words: '' Another form of contract might be *more expedient or cheaper.* The courts do not sit in judgment upon questions of legislative policy or administrative discretion.'' (Italics mine.) (*Campbell* v. *City of New York,* 244 N. Y. 317, 328.) This principle seems too well settled to give it further consideration. (See, also, *Martens & Co., Inc.,* v. *City of Syracuse,* 183 App. Div. 622, 628; *Talcott* v. *City of Buffalo,* 125 N. Y. 280; *Daly* v. *Haight,* 170 App. Div. 469, affd. 224 N. Y. 726; *Pilbeam* v. *Sisson,* 204 App. Div. 762, 766; *Hearst* v. *McClellan,* 102 App. Div. 336, 338.)

I, therefore, hold upon the record before me that I possess no power or authority to pass upon the administrative acts of the defendants here under attack.

Let us look more closely at the claim that under the project as revised '' excess '' lands were purchased in violation of law. I cannot go along with this contention. As I review the testimony in the light of sections 1 and 6 of article XVIII of the Constitution and subdivision 14 of section 3 of the Act, I cannot discover where these provisions have been exceeded or transgressed. As I read the law it contemplates the purchase of lands needed for the construction and protection of housing projects whether such land is occupied by substandard and insanitary buildings, or structures not so classified, or is unimproved, if, in good faith, the authority deems such action necessary for the proper development of the project, with the right to dispose by sale or lease of any property in excess of the building and recreational needs of the project, subject to such restrictions as will preserve and protect the improvement (N. Y. Const., art. XVIII, §§ 8, 9).

Support for these conclusions is found in the words of Judge LEWIS: "We find no sound basis for the constitutional objection advanced by the petitioners that the condemnation of private property authorized by the Redevelopment Companies Law is not for a public use. Such a suggestion is refuted by the language of the Constitution itself which specifically proclaims that those separate grants of power to the Legislature made in article XVIII section 1 — to provide for low rent housing *or* for clearance and rehabilitation of substandard areas — are 'public purposes.' The question of what is a public purpose being primarily a matter of State concern (*Clark* v. *Nash,* 198 U. S. 361, 367, 368), we look to the formal statement of legislative policy which was declaratory of the purpose and led to the enactment of the Redevelopment Companies Law. That statement in the statute (§ 2) concludes as follows: '* * * the necessity *in the public interest* for the provisions hereinafter enacted is hereby declared as a matter of legislative determination.' (See, also, § 20.) Although we are aware that such a declaration of legislative policy is not conclusive upon the question of public purpose (*Block* v. *Hirsh,* 256 U. S. 135, 154), we cannot say that the declarations by the Legislature of the reasons for the enactment of the statute now challenged are 'palpably without reasonable foundation.' Accordingly we give them weight. (*United States* v. *Gettysburg Electric Ry. Co.,* 160 U. S. 668, 680; *Block* v. *Hirsh, supra,* p. 154.)'' (*Matter of Murray* v. *La Guardia,* 291 N. Y. 320, 329, 330, *supra.*)

Plaintiff's counsel urged that the purchase of property in excess of that actually needed for the development constituted in effect a taking of property of one individual to be devoted to the private use of another, and that the expense so incurred is unwarranted and a waste of taxpayers' money. In support of his claim he cites the following Court of Appeals case in which a public corporation organized under the Municipal Housing Authorities Law sought to condemn the defendant's premises for clearance, replanning and reconstruction of part of an area in New York City containing substandard and insanitary housing conditions. The petitioner had acquired property contiguous on both sides of defendant's premises. Condemnation was resisted on the ground that the Municipal Housing Authorities Law violates the State and Federal Constitutions "because it grants to petitioner the power of eminent domain for a use which is not a public use." In developing his opinion Judge CROUCH wrote (pp. 339, 340–341, 342): " Slum areas are the breeding places of disease which take toll not only from denizens, but, by spread, from the inhabitants of the entire city and State. Juve-

nile delinquency, crime and immorality are there born, find protection, and flourish. Enormous economic loss results directly from the necessary expenditure of public funds to maintain health and hospital services for afflicted slum dwellers and to war against crime and immorality. Indirectly there is an equally heavy capital loss and diminishing return in taxes because of the areas blighted by the existence of the slums. Concededly, these are matters of State concern (*Adler* v. *Deegan,* 251 N. Y. 467, 477), since they vitally affect the health, safety and welfare of the public. * * * The fundamental purpose of government is to protect the health, safety and general welfare of the public. All its complicated activities have that simple end in view. * * * It is also said that since the taking is to provide apartments to be rented to a class designated as 'persons of low income,' or to be leased or sold to limited dividend corporations, the use is private and not public. This objection disregards the primary purpose of the legislation. * * * The designated class to whom incidental benefits will come are persons with an income under $2,500 a year, and it consists of two-thirds of the city's population. But the essential purpose of the legislation is not to benefit that class or any class; *it is to protect and safeguard the entire public* from the menace of the slums.''

Plaintiff's counsel quoted the following excerpt from this opinion (p. 343): ''Nothing is better settled than that the property of one individual cannot, without his consent, be devoted to the private use of another, even when there is an incidental or colorable benefit to the public.''

But the case as a whole offers no comfort to the plaintiff. Judge Crouch, in upholding the application for condemnation, went on to·say in the balance of the same paragraph cited by her counsel (p. 343): ''The facts here present no such case. In a matter of far-reaching public concern, *the public is seeking to take* the defendant's property *and to administer it as part of a project conceived and to be carried out in its own interest and for its own protection. That is a public benefit, and,* therefore, at least as far as this case is concerned, *a public use.*'' (Italics mine.) (*Matter of N. Y. City H. Authority* v. *Muller,* 270 N. Y. 333, *supra.*) In our case, disposition by lease or sale of any excess land under restrictions protective to the housing units is within the meaning of public use. For instance, a proper restriction of commercial or industrial development near the Washington courts would preserve that neighborhood from deterioration through lack of supervision and furnish employment to the low income tenants

Much time has been devoted by plaintiff upon the trial and in her brief to the subject of "low rent housing", "persons of low income" and "families of low income". All these terms are necessarily relative. The standards therefor vary in different communities. A standard could not be fixed by legislative edict. No court, so far as I can discover, has attempted or even suggested greater precision than achieved by the Legislature of this State in its definition of the terms. Subdivision 18 of section 3 of article I of the Act provides: "The terms 'persons of low income' and 'families of low income' mean persons or families who are in the low income groups and who cannot afford to pay enough to cause private enterprise in their municipality to build a sufficient supply of adequate, safe and sanitary dwellings."

Section 156 of the Act provides a schedule of rentals based upon the income of the tenant. Subdivision 2 of section 215 having to do with defense housing, in defining the term "persons of low income engaged in national defense activities" described the duties of the authority developing or administering the defense housing project and delegates as an administrative duty that of determining who "cannot afford to pay enough to cause private enterprise to build a sufficient supply of adequate, safe and sanitary dwellings for such persons when needed within the vicinity of such national defense activities." It seems to me that in its attempt to point the way, the Legislature showed a fine definitive sense, making plain the essence of "low income" and "low rent housing" without incasing the terms within inflexible limits. Mr. Justice PERSONIUS so completely expressed my views that I adopt his phraseology in the following opinion: "Perhaps the Legislature could have specified in dollars what would have constituted low income and low-rent housing. Perhaps it could have specified what structural conditions, et cetera, are necessary to make a dwelling sanitary. However, standards of income and rent vary in different communities. We cannot say that the general definitions of the Legislature, leaving their application to the local Authority, are illegal or unconstitutional. Incomes and rentals vary in peace times and war times." (*Davidson* v. *City of Elmira,* 180 Misc. 1052, 1057, *supra.*)

As I study the revised Contract, plan and project here under review and the action proposed thereunder, I cannot discover where, or in what respect, these defendants have violated either the letter or the spirit of the law in their efforts to provide a low rent housing project to accommodate persons of low income.

The plaintiff alleges " That the amended ' Plan ' and ' Project ' does not afford adequate School, Church, Trading,

and Working Facilities and Conveniences within easy and convenient walking distance. That these considerations add to and supplement the expenses incident to living in the proposed areas. That there is entailed the additional burden upon the taxpayers of supplying and furnishing schools and school facilities and further additional cost in the event the occupants require welfare and other relief." Frankly, I feel that, in the light of the testimony, these claims are insubstantial and that the contention as to welfare and relief is misleading. The Authority passes on the income of the tenants. They are not welfare families, but families of low income. Even if circumstances should necessitate relief for a time, can it be said such assistance would not be indicated were they living in some other section of the city, or that it would be more costly in a housing unit than in private property?

Paragraph 208 of the Contract provides for the furnishing of certain city services such as fire, police, and health protection, educational and recreational facilities, light, water, sewage, et cetera. These services are all authorized by section 99 of the Act, to be furnished or performed by the City under a contract in connection with a housing project. Contracting to furnish such services cannot, of course, be either illegal or a waste of city money in the sense used in section 51 of the General Municipal Law.

From a careful study of the record, I can find no act on the part of any of the defendants which evidenced a lack of good faith or which resulted in a waste of public property or threatened or imperiled the public interest.

Assuming, but not conceding, that in revising the Contract, plan and project and attempting to fulfill it, one or more of the defendants in good faith committed some illegal act which caused no waste nor imperiled the public interest, such acts would fall within the well-settled rule that mere illegality is not enough to justify the institution of taxpayer's action. Chief Judge HISCOCK in a well-reasoned opinion, said:

" Under the provisions of the [General] Municipal Law the action may be maintained for the purpose of preventing any illegal act or for preventing waste or injury to any property, funds or estate of the municipality. As we have pointed out, there are no findings which support it upon the latter ground and the plaintiff must rely upon the first ground of illegality.

"Mere illegality is not enough. The very nature and purpose of a taxpayer's action like the present one presume that there will be more than illegality in order to enable him to intervene.

The basic theory of such an action is that the illegal action is in some way injurious to municipal and public interests and that if permitted to continue it will in some manner result in increased burdens upon and dangers and disadvantages to the municipality and to the interests represented by it and so to those who are taxpayers. It was not the intention of the statute that a taxpayer shall be allowed to intervene and bring to the decision of the courts every act of a municipal officer which may be claimed to be illegal although concededly it is entirely innocuous." (*Western N. Y. Water Co.* v. *City of Buffalo,* 242 N. Y. 202, 206–207.)

We may, therefore, safely conclude that in order to succeed the plaintiff must establish illegality resulting in waste or injury, or the threatened act must be such as to imperil the public interests or calculated to work public injury or produce some public mischief (*Altschul* v. *Ludwig,* 216 N. Y. 459, 467; see *Anger* v. *Galloway,* 61 N. Y. S. 2d 215). I hold that the plaintiff has failed to meet this burden.

The issues before this court are of grave and far-reaching import. The concern of the agencies represented by the defendants, no less than the anxiety of the taxpayers, is easy to understand. In matters of public policy, it not infrequently occurs that individual interests must bow before the greater good of the many. So in the instant case, the convenience and desires of the few whose homes will be taken or affected by the revision must give way to the larger benefits which will flow to the tenants occupying these new sites and the City of Utica as a whole. I was impressed upon this trial by the earnest co-operation between the various agencies. After conferences between representatives of the State, the Authority, the city officials and interested groups including the real estate board of the city, it was decided that the postwar housing should consist of 400 units rather than 350 envisioned in the original plan, and that the ends desired would be better accomplished if this block were equally divided between two sites in different parts of the city. With the consent and approval of all counsel, I visited the four sites which are the subject of this controversy and was favorably impressed with the revision. The amended plan provides for a large playground as a buffer between Washington Courts and the industrial area; the transfer to the City of a plot adjacent to the Potter Street School for playground purposes; the clearance and resale of unneeded portions of Site D (originally intended for postwar housing) for industrial and for industrial and commercial development under restrictions

protective and advantageous to Site A. The location of the postwar housing in two separate units appears to me to be beneficial to all concerned. It relieves the Washington Courts section of the congestion which would have accompanied the housing of 547 families in this area where pedestrian, vehicular and rail traffic is already heavy; it gives the B and C developments the advantage of more open terrain in sparsely developed sections where the number of families housed will not constitute problems of facilities, services and transportation beyond the reasonable power of the City to supply.

I am not impressed by plaintiff's claim of inconvenience and hardship which these Sites B and C will entail upon labor and school attendance. The commissioner considered these features and, based upon thorough investigation, in the exercise of his administrative discretion concluded adequate facilities in these respects would be available. In the absence of any evidence of fraud or willful misfeasance, the findings of the commissioner stand.

In pressing her attack against the defendants, the plaintiff loosed so many arrows at all their acts in connection with the implementing of the Contract, plan and project, that it has been difficult to discuss her claims with any semblance of order. I have not attempted to review separately the voluminous claims set forth in the fifty paragraphs of the complaint. However, I have given careful consideration to each in the light of the law and the evidence adduced upon the trial, and am satisfied that the conclusions at which I have arrived have disposed of the issues supported by proof. After a review of the entire record, I find no evidence justifying the claim of illegal acts on the part of the defendants, or any of them, resulting in waste or injury to the property of the City or its taxpayers, or of any threatened act which will imperil public interest or work public injury or mischief.

The prayer for injunctive relief is denied. The complaint is dismissed.

All objections interposed to the introduction of evidence during the trial upon which decision was reserved are overruled with exceptions.

The respective motions for the dismissal of the complaint made at the close of proofs are granted with exceptions.

Findings of fact and conclusions of law shall be prepared and submitted in accordance herewith.