In the Matter of the Petition of the City of Lebanon, a Municipal Corporation, for a Pro Forma Decree authorizing the issuance of $200,000 principal amount of water revenue bonds of said city: CITY OF LEBANON, Petitioner-Respondent, v. A. S. SCHNEIDER, Intervener-Appellant.—163 S. W. (2d) 588.

Court en Banc, June 27, 1942.

*Don O. Vernon* and *Bowersock, Fizzell & Rhodes* for intervener-appellant.

714

*W. I. Mayfield* and *Phil M. Donnelly* for respondent.

CLARK, J.—In May, 1942, the City of Lebanon instituted this proceeding by filing in the circuit court its petition, pursuant to Sections 3312-3316, Revised Statutes Missouri 1939 [Mo. R. S. A., secs. 3312-16, pp. 495-497], praying for a *pro forma* decree authorizing the issuance of water revenue bonds in the principal sum of $200,000.00 and adjudicating the validity thereof. Notice was duly given and

intervener filed his petition attacking the constitutionality of the statute under which the city is proceeding, and questioning certain provisions of Ordinance No. 1035 of the city authorizing the bonds. After a trial, the circuit court decided all the issues in favor of the city and intervener has appealed.

The bonds are being issued under the National Defense Cooperation Act (hereinafter called The Act), enacted by the Missouri General Assembly in 1941 and found in the session acts for that year at pages 493 to 505.

Pursuant to an ordinance an election was duly held in said city on March 24, 1942, submitting a proposition to issue said bonds for the purpose of financing a part of the cost of improving and extending the existing waterworks system of the city, resulting in a vote of 875 for and 22 against the bonds. It was provided that the bonds are not to be a general liability of the city, nor payable from taxes, but to be payable solely from the income from the waterworks system as provided by The Act. Afterward the city passed Ordinance No. 1035 authorizing the issuance of the bonds, prescribing the details of sale and certain covenants by the city to safeguard payment.

It is conceded that Lebanon is located in a "defense area" as defined in The Act, being forty miles from Fort Leonard Wood where about 35,000 soldiers are usually stationed. The Federal census of 1940 gave the city's population as 5,025, while the sugar rationing registration in May, 1942, shows a population of about 8,000. Nearly 400 residences have been constructed in the city since 1940, besides a twenty-nine family apartment house and some thirty-five new business houses. The water and sewer systems are grossly inadequate and fire protection is likewise deficient. The State Board of Health has notified the city that its water supply "represents a serious hazard to the health of the citizens." To aid in correcting these conditions, the Federal government has offered the city two grants: One of $91,000.00 to aid in the waterworks improvement ▉ to cost $291,000.00; the other of $276,000.00 to pay the entire cost of increased sewer facilities.

▉ First, appellant says The Act is a local or special law in violation of Section 53, Article IV, and Section 7, Article IX, of the Missouri Constitution. Said Section 53 lists a number of subjects about which the General Assembly shall not pass a local or special law and contains a general provision that "in all other cases where a general law can be made applicable, no local or special law shall be enacted; and whether a general law could have been made applicable in any case is hereby declared a judicial question, and as such shall be judicially determined, without regard to any legislative assertion on the subject." Said Section 7 provides for the organization and classification of cities and towns in not to exceed four classes so that

municipal corporations of the same class shall possess the same powers and be subject to the same restrictions.

. The Act authorizes the issuance of revenue bonds for specified purposes by municipalities located within "defense areas," defined as the territory within the radius of fifty miles of a camp, fort, etc., within which not less than 10,000 persons are stationed, except the territory contained in any county now or hereafter having a population of not less than 200,000 nor more than 400,000 inhabitants, or any municipality located in such a county.

Appellant says The Act is a special or local act because the attempted classification is arbitrary and unreasonable; that it does not apply to every community in the State where the same conditions exist, but only to municipalities located in "defense areas" and not to them if located in a county now or hereafter containing a population of not less than 200,000 nor more than 400,000.

Diligent counsel on both sides of this case have cited many cases in which this court has considered the above mentioned constitutional provision. In those cases we have upheld, or denied the validity of, legislative acts in accordance with our view as to whether they were based upon reasonable or unreasonable classifications. In State ex rel. Daily Record Co. v. Hartmann, 299 Mo. 410, 253 S. W. 991, we said: "If there is a reasonable basis for the classification, the law must stand. If there is no reasonable basis the law must fall. This rule is so universal that citations would be superfluous." In that case we upheld a law which related to the publication of legal notices in cities having a population of 100,000 or more. In State ex rel. Carpenter v. City of St. Louis, 318 Mo. 870, 2 S. W. (2d) 713, an act was upheld applicable only to a city containing over 300,000 inhabitants. The Act was attacked as violative of Section 7, Article IX, of the Constitution on the ground that the General Assembly having already divided cities into four classes as authorized by that section could not make a further classification. We denied this contention, overruling some earlier cases, and said: "Many general laws have been enacted and their validity upheld, though made to apply to cities according to their population without regard to the general classification." [See also: Davis v. Jasper County, 318 Mo. 248, 300 S. W. 493; Hines v. Hook, 338 Mo. 114, 89 S. W. (2d) 52; State ex rel. Zoolog. Board v. St. Louis, 318 Mo. 910, 1 S. W. (2d) 1021; State ex inf. Atty. Gen. v. Curtis, 319 Mo. 316, 4 S. W. (2d) 467; State v. McCann, 329 Mo. 748, 47 S. W. (2d) 95; Hull v. Baumann, 345 Mo. 159, 131 S. W. (2d) 721; Roberts v. Benson, 346 Mo. 676, 142 S. W. (2d) 1058.]

The Act purports to be a general law. By its express terms it is applicable to all municipalities now or hereafter located in "defense areas" except in counties of a certain population. This gives rise to two questions: First, do cities located in such areas have problems

peculiar to them which do not usually pertain to cities not so located? Second, does the exception as to cities in counties containing from 200,000 to 400,000 destroy The Act?

The Act contains a declaration to the effect that the sudden expansion of camps and other governmental establishments due to the National emergency has resulted in rapid and large concentration of civilian population within such areas, and that the sewage collection and disposal, water and other facilities of such cities, except within counties now or hereafter having a population between 200,000 and 400,000, are not adequate to meet the extraordinary demand caused by such concentration of civilian population, with the result that the health, safety and welfare of those within and close to such environments are in grave danger.

We are not bound by the legislative declaration, but it is entitled to great weight. [Laret Investment Co. v. Dickmann, 345 Mo. 449, 134 S. W. (2d) 65, and cases cited.] In the instant case the legislative assertion was not an exaggeration as to the effect of the location of an army camp, for the rapid increase in the city's population and the inadequacy of its facilities are fully borne out by the testimony already mentioned. Such results, in greater or lesser degree, are certain to follow the establishment of an army camp; they *may* ensue from other causes, but The Act is not invalidated because it fails to provide for every possible contingency. Then, too, the General Assembly passed The Act to cooperate with the Federal government which has provided aid only to relieve conditions caused by its own acts in establishing camps, etc.

The exclusion from The Act of territory in counties containing between 200,000 and 400,000 inhabitants now affects only St. Louis County, but will apply to any county which hereafter attains that population. We do not know what evidence the General Assembly had before it which impelled it to make that exception. Existing statutes applicable to the excepted counties or other conditions may have made it unnecessary to include them in The Act. The presumption is always in favor of constitutionality. In Hull v. Baumann, supra, and Roberts v. Benson, supra, we held that the exclusion from the Jones-Munger law (relating to the collection of taxes), of counties between 200,000 and 400,000 population did not make the law unconstitutional.

Appellant says that The Act violates Section 12 of Article X, of the Missouri Constitution, by permitting a city of less than 75,000 inhabitants to issue revenue bonds, the argument being that said section expressly grants the power to all cities having a population of 75,000 or more and impliedly prohibits all cities having less than that population from issuing such bonds.

This question was suggested, but not decided, in State ex rel. Blue Springs v. McWilliams, 335 Mo. 816, 74 S. W. (2d) 363. In State

ex rel. Hannibal v. Smith, 335 Mo. 825, 74 S. W. (2d) 367, we sustained the legality of an issue of revenue bonds of the city of Hannibal, payable out of bridge tolls, and in State ex rel. Excelsior Springs v. Smith, 336 Mo. 1104, 82 S. W. (2d) 37, we upheld an issue of revenue bonds of the city of Excelsior Springs, payable out of income from municipal mineral springs and bath facilities. The cities of Hannibal and Excelsior Springs each contain less than 75,000 inhabitants, but the point now under consideration was not discussed in those cases. In Woodmansee v. Kansas City, 346 Mo. 919, 144 S. W. (2d) 137, the point was, in effect, decided. There Kansas City sought to issue revenue bonds to enlarge and improve its public market. While Kansas City has a population of many times 75,000 it did not proceed under the provisions of said Section 12 of Article X, but under its charter without the four-sevenths vote required by the constitutional provision. We sustained the bonds, saying that Section 12 of Article X had no application. We pointed out that revenue bonds voted and issued under said Section 12 of Article X, by cities of 75,000 or over, have two attributes not possessed by other revenue bonds, namely, (1) the city may provide by ordinance for paying the principal or interest due in any year out of general revenue of that year raised by taxation, and (2) the city has power to execute a mortgage on the utility to secure the payment of the revenue bonds. Again, in Dodds v. Kansas City, 347 Mo. 1193, 152 S. W. (2d) 128, we sustained an issue of water revenue bonds by Kansas City, although it is apparent that such bonds were not voted in accordance with said Section 12, and did not have the attributes of revenue bonds authorized by that section of the Constitution. For the same reasons, the bonds in the instant case are not of the same type as those authorized by said section. So, the fact that the Constitution authorizes cities of 75,000 or more inhabitants to issue revenue bonds of a certain type does not impliedly prohibit cities of less population from issuing revenue bonds of a distinctly different type where, as here, they are issued under the express terms of a statute.

Appellant contends that certain provisions of Ordinance No. 1035 make the revenue bonds an indebtedness of the city and therefore invalid because not submitted to a vote in the manner provided by said Section 12 of Article X of the Constitution. The ordinance provides that income derived from the existing waterworks system, as well as from any extensions, shall be placed in a special fund and used to pay the principal and interest of the bonds, after payment of operation, maintenance, etc.; also that, in the event the income shall at any time become insufficient to make the necessary payments, the city is authorized to make a fair and reasonable payment into the fund for all water or water service furnished to it or any of its departments.

In Bell v. City of Fayette, 325 Mo. 75, 28 S. W. (2d) 356, certain language indicates that ▇▇ the court was of the opinion that if the city's obligation had been payable out of revenues from an existing utility, and not solely out of income from extensions, the obligation would have constituted "indebtedness" within the meaning of the constitutional provision. In this connection the court quoted from an Illinois case, Schnell v. City of Rock Island, 232 Ill. 89, but in Grossman v. Public Water Supply District, 339 Mo. 344, 96 S. W. (2d) 701, we said that the Illinois case had been overruled by later decisions of the Supreme Court of that state and, after reviewing many cases, we held that the use of income from an existing utility as well as from the extensions, to pay bonds issued for the extensions, did not create "indebtedness" within the meaning of the constitutional provision, if the extensions were necessary to make the utility function adequately. The same view is expressed in Woodmansee v. Kansas City, 346 Mo. 919, 144 S. W. (2d) 137, and Dodds v. Kansas City, 347 Mo. 1193, 152 S. W. (2d) 128.

The instant case comes squarely within the cases last cited for the testimony shows that the proposed extensions are necessary to make the system function.

The obligation of the city to pay into the special fund the reasonable cost of water and water service used by it, in the event the income from the system shall be insufficient, is a contingent liability which may or may not come to pass. In State ex rel. City of Hannibal v. Smith, 335 Mo. 825, 74 S. W. (2d) 367, we held that such a contingent liability did not make the bonds an "indebtedness" of the city. To the same effect is Woodmansee v. Kansas City, supra.

▇▇ Appellant cites certain other provisions of Ordinance No. 1035 which he claims are so unreasonable as to make the ordinance void. They are: that the entire revenue from the waterworks, after payment of operation, maintenance, etc., are devoted to the payment of the bonds for the twenty-five years they shall remain outstanding; that the city shall establish and maintain such rates for water as will cover the necessary payments; that the city shall not mortgage the plant during the life of the bonds and any future bond issue shall be subordinate to the bonds; and that, under certain conditions, a receiver may be appointed to operate the plant.

All these provisions are expressly authorized by The Act. We see nothing unreasonable in them and, being in conformity with the express terms of the statute, they are presumed to be valid. [City of St. Louis v. United Railways, 263 Mo. 387, 174 S. W. 78; Kansas City v. Liebi, 298 Mo. 569, 252 S. W. 404; Grossman v. Public Water Supply Dist., 339 Mo. 344, 96 S. W. (2d) 701.] Of course, the provisions as to rates, service and manner of operation are subject to any authority, now or hereafter vested in the Public Service Commission.

722

Finally, appellant says that the bonds were not advertised for sale as required by The Act, because the advertisement failed to state the exact amount of bonds that would become due each year.

The Ordinance contained a detailed schedule of maturities and this schedule was furnished to each bidder. The advertisement was in substantial compliance with The Act and is sufficient.

We find no error and the decree should be and is hereby affirmed. All concur.