CONSUMERS EDUCATION AND PROTECTIVE ASSOCIATION, INTERNATIONAL, INCORPORATED, Pennsylvania Public Interest Research Group, The Green Party, Lance S. Haver, Tina H. Nelson, Richard Mitchell Deighan, Robert B. Sklaroff, M.D., Appellants,

v.

The CITY OF PHILADELPHIA, Mayor John F. Street, Janice Davis, Director of Finance.

Commonwealth Court of Pennsylvania.

Argued Nov. 7, 2001.

Decided Sept. 18, 2002.

Samuel C. Stretton, West Chester, for appellants.

William R. Thompson and David Smith, Philadelphia, for appellees.

Before DOYLE, Senior Judge,[1] COLINS, President Judge, McGINLEY, Judge,[2] SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge.

[1] This case was assigned prior to the date when President Judge Doyle assumed the status of senior judge on January 1, 2002.

The decision in this case was reached before the resignation of Senior Judge Doyle.

[2] This case was argued before Judge Kelley recused and Judge McGinley was substituted in his place.

OPINION BY Senior Judge DOYLE.

Consumers Education and Protective Association, International, Incorporated (CEPA), Pennsylvania Public Interest Research Group, The Green Party, Lance S. Haver, Tina H. Nelson, Richard Mitchell Deighan, and Robert B. Sklaroff, M.D. (collectively, Appellants[3]) appeal from an order of the Court of Common Pleas of Philadelphia County denying Appellants' request for injunctive relief and their request that certain ordinances of the City of Philadelphia be declared null and void. The order also granted the motion for compulsory nonsuit under Pa. R.C.P. Nos. 230.1 and 1512 filed by the City of Philadelphia, the Honorable John F. Street, Mayor, Janice Davis, Director of Finance, and the Philadelphia Authority for Industrial Development (PAID)[4] (collectively, Appellees).

This case is centered upon certain ordinances that were passed by Philadelphia City Council, which authorized Appellees to enter into a series of leases for the financing of two new stadiums in the City: a football stadium for the Philadelphia Eagles, a professional football team in the National Football League, and a baseball stadium for the Philadelphia Phillies, a professional baseball team in the National League. City Council held several days of public hearings and passed the ordinances on December 20, 2000, by a vote of fifteen to two. Ordinance 721–A basically authorized the new stadium for the Eagles, while Ordinance 722–A basically authorized the new stadium for the Phillies.

Appellants' equity suit challenged the ordinances that were signed into law by Mayor Street on December 28, 2000. These ordinances, particularly Ordinances 721–A and 722–A, set the structure for the development, finance, construction and operation of a new baseball ballpark and football stadium in South Philadelphia at a cost of a little over one billion dollars. The City will provide $394 million towards the project; the Teams and the Commonwealth will provide the bulk of the remaining funds, although there is a $53 million shortfall in funding and no record of a source to provide for the difference. By ordinance, however, the source of the $53 million must be other than the City.

City Council authorized the ordinances and the attached attendant leases pursuant to the Philadelphia Home Rule Charter (Home Rule Charter or Charter),[5] the

---

3. CEPA is a nonprofit organization devoted to improving life in the City of Philadelphia and concerned with any of the City's policies that affect the City's fiscal health. Its members include citizens, voters, and taxpayers of Philadelphia. The Pennsylvania Public Interest Research Group is an organization with an office in Philadelphia, the mission of which is to deliver persistent, result-oriented public interest activism that protects the environment, encourages a fair, sustainable economy, and fosters responsive democratic government. The Green Party is a national political organization with an office in Philadelphia, a chief concern of which is to curb excessive influence of corporations on government and society. Lance S. Haver is an adult citizen, registered voter and taxpayer, and also serves as Chair of CEPA. Tina H. Nelson is an adult citizen, registered voter and taxpayer and also serves as CEPA's Executive Director. Richard Mitchell Deighan is an adult citizen, registered voter and taxpayer and has served as Chair of the Northern Liberties Neighbors Association. Robert B. Sklaroff, M.D. is an adult citizen, registered voter and taxpayer and performs some of his professional work in Philadelphia.

4. PAID intervened with the consent of the parties based on its status as a party to each of the leases authorized by the Ordinances. (See Common Pleas Order dated February 14, 2001).

5. Sections 1–100 to 12–503 of the Pennsylvania Code, 351 Pa.Code §§ 1.1–100–12.12–503.

Economic Development Financing Law,[6] the Capital Facilities Debt Enabling Act[7] and the Eminent Domain Code.[8] City Council's vote of fifteen to two was the result of over two years of negotiations between all of the interested parties and seven days of public hearings during which many different individuals testified for and against almost every aspect of the proposal, including the project's financial risks and the structure established to handle the risks.

Ordinances 721–A and 722–A establish a four-lease structure for acquiring, financing, constructing and operating each stadium. The City will provide most of its share of stadium funds through this complex lease arrangement. The four types of leases involved are the **Ground Lease** Agreements between the City and PAID (providing for the City's lease to PAID of certain lots of land owned by or to be acquired by the City), the **Prime Lease** Agreements (agreements between PAID and the City that provide for the sublease by PAID back to the City of all or a part of such land and certain improvements to be built on the land, including the Eagles' stadium and the Phillies' ballpark), the **Lease-back Lease** Agreements (agreements between PAID and the City that provide for the sub-sublease of the improved land back from the City to PAID, which in turn allow PAID as landlord to enter into the Team Subleases with the Eagles and the Phillies). The **Team Subleases** outline project development, financial terms, and nonfinancial terms. With respect to the nonfinancial terms, the Sublease Lease Terms and Conditions provide that the term of the leases is a "30 year base term, with ten consecutive five year

renewal options exercisable by the Team[s]." (Eagles' Lease and Development Terms and Conditions at 7); (Phillies' Lease and Development Terms and Conditions at 7). The terms of each of the four Eagles' leases are largely the same as the terms of the Phillies' leases. The parties to the leases are the City, PAID, the Eagles and the Phillies.

City Council did not actually approve copies of the Team Sublease agreements themselves as part of the ordinances; instead, City Council approved two documents titled "Eagles Lease and Development Agreement Terms and Conditions" and "Phillies Lease and Development Agreement Terms and Conditions." These Sublease Terms and Conditions were approved as exhibits to Ordinances 721–A and 722–A, which ordinances authorized the City to approve team subleases conforming in all material respects to those terms and conditions. The Ordinances required the parties to file copies of the Team Subleases with City Council, and required City Council to act on the subleases within thirty days. The ordinances authorized the City Solicitor to insert additional terms in the Team Subleases consistent with the approved Team Sublease Terms and Conditions. On February 1, 2001, City Council approved the Team Subleases by resolution. Under the Team Subleases, PAID, acting as a landlord, leased the improved land to the Eagles and Phillies as tenants. The purpose of the Team Subleases is to provide for the substantial private finance component of the stadium projects and to set the limits of the local public contribution to the projects.

6. Act of August 23, 1967, P.L. 251, *as amended,* 73 P.S. §§ 371–386, retitled the Economic Development Financing Law by Section 1 of the Act of December 17, 1993, P.L. 490.

7. Act of February 9, 1999, P.L. 1, 72 P.S. §§ 3919.101–3919.5102.

8. Act of June 22, 1964, Special Sess., P.L. 84, *as amended,* 26 P.S. §§ 1–101–1–903.

On appeal, Appellants raise the following issues: (1) Common Pleas erred by holding that the debt limitation found in Article 9, Section 12 of the Pennsylvania Constitution was not violated, and; (2) Common Pleas erred by holding that the ordinances and leases did not violate the Home Rule Charter.[9]

Regarding the first issue, Appellants assert that the ordinances and leases at issue for the funding of the two stadiums in Philadelphia County violate the debt limitation[10] set forth in Article 9, Section 12 of the Pennsylvania Constitution. Article 9, Section 12 provides, in pertinent part, as follows:

> The **debt** of the City of Philadelphia may be increased in such amount that the total **debt** of said city shall not exceed thirteen and one-half percent of the average of the annual assessed valuations of the taxable realty therein, during the ten years immediately preceding the year in which such increase is made, but said **city shall not increase its indebtedness to an amount exceeding three percent upon such average assessed valuation of realty, without the consent of the electors thereof at a public election** held in such manner as shall be provided by law.

PA CONST. art. IX, § 12 (emphasis added).

Appellants argue that the City of Philadelphia's financial responsibility under the ordinances and lease agreements exceeds the constitutional debt limitation for the City of Philadelphia, which argument raises the essential issue to be decided by this Court: is the financial obligation of the City under the ordinances "debt" as that constitutional term has been defined by the Courts.

In *Conrad v. City of Pittsburgh*, 421 Pa. 492, 218 A.2d 906 (1966), a resident and taxpayer of the City of Pittsburgh instituted an action in the Court of Common Pleas of Allegheny County to restrain the City of Pittsburgh and the Stadium Authority of the City of Pittsburgh from proceeding with the construction of what was to be known as "Three Rivers Stadium." The city formed the authority[11] for the purpose of constructing the Stadium and proposed to provide the site upon which the Stadium was to be constructed and to loan certain sums to the authority for the purpose of initiating the endeavor. The authority adopted a plan whereby it would finance and construct the Stadium and then sublet the Stadium to the Pittsburgh Athletic Co., Inc. (the Pittsburgh Pirates), a major league baseball franchise, and the Pittsburgh Steelers Football Club, in the National Football League. The city and the authority entered into an agreement, pursuant to the enabling act, whereunder the city agreed to make an annual grant to the authority in the event and to the extent of any deficiency between the income to be derived from the tenants of the Stadium and the amount required by the authority to service its debt and maintain the facility. The agreement provided that the city should pay the authority from *current rev-*

---

**9.** Our standard of review in assessing the propriety of a common pleas court decision is limited to a determination of whether constitutional rights have been violated or whether common pleas abused its discretion or committed an error of law. *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882 (1994).

**10.** It was agreed by the parties, and Common Pleas explained, that the City's rental payments would have to retire $304 million in debt, which exceeds the constitutional limit of $270 million pursuant to Section 12 of the *Constitution*.

**11.** The authority was formed pursuant to the Public Auditorium Authorities Law (herein referred to as the "enabling act"), Act of July 29, 1953, P.L. 1034, 53 P.S. §§ 23841–23857.

*enues* and that in the event that any annual grant is not paid in full when due, the deficiency should be paid out of *current revenues* of the city in *the subsequent year or years.*

The plaintiff, in *Conrad,* argued that the agreement, which provided for annual grants by the city in the event of an operating deficiency by the authority, constituted a debt incurred in violation of Sections 8 and 10 of Article 9 of the Pennsylvania Constitution.[12] Our Supreme Court held that the provision of the agreement between the city and the authority did not create "debt" within the purview of the Constitution because the obligation of the city to make payments to the authority was expressly from current revenues only. The Court explained that contracts or engagements, which create obligations not exceeding current revenues, do not constitute debts within the contemplation of the Constitution. *See Apollo Borough School District v. Kiskiminetas Township School District,* 399 Pa. 80, 159 A.2d 705 (1960); *Detweiler v. Hatfield Borough School District,* 376 Pa. 555, 104 A.2d 110 (1954); *Greenhalgh v. Woolworth,* 361 Pa. 543, 64

A.2d 659 (1949); *Gemmill v. Calder,* 332 Pa. 281, 3 A.2d 7 (1938); *Kelley v. Earle,* 325 Pa. 337, 190 A. 140 (1937); *Keller v. City of Scranton,* 200 Pa. 130, 49 A. 781 (1901); *Wade v. Oakmont Borough,* 165 Pa. 479, 30 A. 959 (1895); *Appeal of City of Erie,* 91 Pa. 398 (1879).

■ In the present case, as in *Conrad,* the City's obligation to make payment to PAID is expressly limited to the availability of current revenues. This is made abundantly clear by the provision of the agreement[13] that provides that "[r]ent shall be payable only out of the *current revenues* of the City...." Section 4.2(a) of the Prime Lease (emphasis added). The lease further provides that in case the current revenues of the city are insufficient then "the City shall include amounts not so paid in the City's operating budget for the ensuing Fiscal Year and shall produce sufficient *current revenues to pay in the ensuing Fiscal Year* such balance due for the preceding Fiscal Year in addition to the amount of Rent due for the ensuing Fiscal Year." *Id.* Appellants assert that the agreement in *Conrad* is different than the agreement in the case before us because

---

**12.** At the time *Conrad* was decided, Article IX, Section 8 of the Pennsylvania Constitution provided as follows:

The debt of any county, city, borough, township, school district, or other municipality or incorporated district ... shall never exceed seven (7) per centum upon the assessed value of the taxable property therein, nor shall any such county, municipality or district incur any debt, or increase its indebtedness to an amount exceeding two (2) per centum upon such assessed valuation of property, without the consent of the electors thereof at a public election in such manner as shall be provided by law.

In addition, Section 10 of Article IX required the following:

Any county, township, school district or other municipality incurring any indebtedness shall, at or before the time of so doing, provide for the collection of an annual tax

sufficient to pay the interest and also the principal thereof within thirty years.

*Conrad,* 421 Pa. at 498–499, 218 A.2d at 909.

**13.** Section 4.2 of the Prime Lease provides, in part, the following:

The Rent shall be payable only out of the *current revenues* of the City and the City agrees to provide for payment of the Rent and include the same in the City's annual operating budget for each Fiscal Year of the City. If the current revenues of the City are insufficient to pay the Rent in any Fiscal Year as the same becomes due and payable, the City shall include amounts not so paid in the City's operating budget for the ensuing Fiscal Year and shall produce sufficient *current revenues* to pay in the ensuing Fiscal Year such balance due for the preceding Fiscal Year in addition to the amount of Rent due for the ensuing Fiscal Year.

the agreement in *Conrad* only required the city to pay the shortfall from current revenue available in that current calendar year. (Appellants' Brief at 27). However, the agreement in *Conrad* specifically provided that " 'in the event that any annual grant is not paid in full when due, the deficiency *is to be paid out of the current revenues of the City in the subsequent year or years* ....' " *Conrad,* 421 Pa. at 498, 218 A.2d at 909 (emphasis added). The agreement in *Conrad* and the agreement in this case both provide that, in the event of a deficiency, the city must provide current revenues in the ensuing or subsequent year or years to cure the deficiency. Therefore, no "debt" in the constitutional sense was incurred because the payment was limited expressly to current revenues.[14] After reviewing Appellants' remaining arguments regarding this issue, we are of the view that the above discussion resolves their concerns.[15]

▆▆▆▆ Appellants also argue that Common Pleas erred in not finding that the ordinances and leases violate Sections 2–201 and 8–200 of the Philadelphia Home Rule Charter.[16] More specifically, Appellants argue that Section 2–201 was violated because the citizens did not have an opportunity to discuss or raise the issue of the lack of funding sources. Appellants explain that Ordinances 721–A and 722–A were rushed through City Council and, as a result, a $53 million gap in funding was unaccounted for in the ordinances. (Appellants' Brief at 34–35). Section 2–201(3) of the Philadelphia Home Rule Charter provides as follows: "No bill shall be so altered or amended during its passage as to change its original purpose. Bills amended shall be printed as amended for the use of the members of the Council and for the information of the public." 351 Pa.Code § 2.2–201(3). Appellants cite *City of Philadelphia v. Weiner,* 121 Pa. Cmwlth. 139, 550 A.2d 274 (1988), *petition for allowance of appeal denied,* 525 Pa. 648, 581 A.2d 574 (1989), to support their argument. In *Weiner,* the issue presented to this Court was whether a bill to amend the Philadelphia realty transfer tax rate had been considered at a public hearing in accordance with Section 2–201(2) of the Philadelphia Home Rule Charter if it remained blank as to the proposed rate of tax, which fact council did not disclose until after adjournment of the public hearings. This Court held that council violated Section 2–201(2) because the rate of tax was never disclosed before or during the public hearings and, thus, council did not provide a complete or meaningful bill to be considered at a public hearing.

In the present case, however, Appellants assert only that the ordinances did not provide the public with knowledge of the **source** of the $53 million. Common Pleas found that the Ordinances provided that there was a $53 million gap in funding, but made clear that the $53 million was not the

---

Prime Lease, Section 4.2 (emphasis added).

14. This Court acknowledges with great admiration and appreciation, Judge Albert Sheppard's articulate and thoughtful discussion of the historical background and case law development regarding the concept of debt in Pennsylvania.

15. Appellants raise an additional issue concerning Bill 010333, which was enacted after Common Pleas issued its opinion. They argue that this bill violates the constitutional

debt limitation because the City will be obligated through nondisturbance agreements for PAID's obligations to the teams. (*See* Appellants' Brief at 30). Again, our standard of review limits this Court to reviewing whether Common Pleas abused its discretion or committed an error of law or to determining whether constitutional rights were violated. *Gibbs.* Since such issue was not raised at the Common Pleas level, we are unable to review it in our appellate jurisdiction.

16. 351 Pa.Code §§ 2.2–201, 8.8–200.

City's obligation. The *Weiner* case is distinguishable because the public was not informed what the tax rate was, whereas here, the public knew there was a $53 million gap in funding, but did not know the source of the money. Here, the terms and conditions included in the "Additional Contributions" section of the Eagles Lease and Development Agreement clearly provide that the

> Team, the City and PAID shall endeavor to obtain promptly from public and private sources an aggregate amount of **$26.5 million,** which will be made available to the Team to complete the Eagles Site Development. Each party shall have the right to terminate if the Additional Contributions are not forthcoming. **In no event shall the City make any contributions from its General Fund toward any portion of the Additional Contributions.**

(Eagles Lease and Development Agreement Terms and Conditions at 5)(emphasis added). These Terms and Conditions of the Team Subleases were attached to the Ordinances and presented to City Council, and both the Phillies and Eagles had the same provision in their agreement, thus the aggregate of $26.5 million for both teams would result in a $53 million dollar gap. Members of City Council questioned witnesses on this topic and citizens and community leaders testified as to their concerns regarding the gap, which is evidence the public knew about the lack of funding. Common Pleas thus concluded that the information was sufficient to provide for meaningful consideration of the terms of the deal, and we conclude that Common Pleas did not err in finding that the information was sufficient for public review. Thus, we find Appellants' argument meritless.

Further, Appellants argue that City Council's approval of the Team Subleases by resolution as opposed to ordinances violated the procedure in the Home Rule Charter under Section 8–200. Section 8–200(3) of the Philadelphia Home Rule Charter provides, in relevant part, as follows: "Contracts may be made for the leasing of real estate and for personal property to be supplied or services to be rendered over a period of more than one year only when permitted by ordinance." 351 Pa.Code § 8.8–200(3). Common Pleas explained that the Terms and Conditions of the Team Subleases were passed in accordance with the Home Rule Charter. City Council properly approved the substance of the Team Subleases by passing the Team Subleases Terms and Conditions in accordance with the Home Rule Charter. The resolution process, by which City Council reviewed the Team Subleases for conformance with the ordinances, was not required by the Home Rule Charter, but instead was invoked pursuant to the language provided for in the Ordinance. Because Appellants do not argue that the Team Subleases do not conform with the Terms and Conditions, we must conclude that Appellants' argument must fail.

Accordingly, we affirm the order of Common Pleas denying Appellants' request for injunctive relief and their request that Ordinances 721–A and 722–A be declared null and void.

Judge SMITH–RIBNER concurs in result only.

Senior Judge KELLEY did not participate in the decision in this case.

### ORDER

AND NOW, this 18th day of September, 2002, the order of the Court of Common Pleas of Philadelphia County in the above-captioned matter is hereby affirmed.